BRANCART & BRANCART
Christopher Brancart (SBN 128475)
cbrancart@brancart.com
Liza Cristol Deman (SBN 190516)
lcristoldeman@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel:   (650) 879-0141

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PHARILYN CHHANG,** | Case |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| **WEST COAST USA PROPERTIES LLC; SERGIO MADRIGAL; and HOUSING AUTHORITY OF THE CITY OF MADERA,** | |
| **Defendants.** | |

1.  Plaintiff Pharilyn Chhang hereby sues her former landlord and public housing authority for violations of federal and state laws.

## I. JURISDICTION AND VENUE

2.  This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 3613. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's state law claims since those state law claims arise out of a common nucleus of operative facts, and form part of the same case or controversy under Article III of the United States Constitution.

3.  Venue is proper because the claims alleged in this complaint arose

-1-

from unlawful conduct occurring in Madera County, California, where the real property at the center of this action is located.

## II. PARTIES

4. Plaintiff Pharilyn Chhang is a person with disabilities within the meaning of the Fair Housing Act, 42 U.S.C. §3602(h), and the Fair Employment and Housing Act, Cal. Govt. Code §12926-12927.  Chhang presently lives in Fresno with her daughter, 13, and Onyx, her emotional support dog.

5. Defendant West Coast USA Properties LLC, a California limited liability company, holds title to the Cypress Apartment located at 121 Cypress Street in Madera.

6. Defendant Sergio Madrigal is the managing member, agent, and chief executive office of West Coast USA Properties LLC.

7. Defendant Housing Authority of the City of Madera is a public housing authority established pursuant to the state Housing Authority Law, Cal. Health & Saf. Code, §§ 34200 to 34380.

8. Each defendant is directly or vicariously liable for the unlawful housing practices alleged in this complaint under the following theories:

    a. For the defendant's own conduct;

    b. For failing to take prompt action to correct and end an unlawful housing practice by that defendant's employee or agent, where the defendant knew or should have known of the unlawful conduct;

    c. Failing to take prompt action to correct and end an unlawful housing practice by a third-party, where the defendant knew or should have known of the unlawful conduct and had the power to correct it; and,

    d. Each defendant is also vicariously liable for unlawful conduct by the defendant's agent or employee, regardless of whether the defendant knew or should have known of the conduct that resulted in the unlawful housing practice, consistent with agency law.

## III. LEGAL FRAMEWORKS

**A.  California's Public Housing Authority Enabling Law**

9.  Defendant Housing Authority of the City of Madera (HACM), like every other public housing authority in California, has its roots in the United States Housing Act of 1937, 42 U.S.C. §§ 1437–1440, which Congress enacted to address "the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income." 42 U.S.C. § 1437. The Act authorizes the federal government "to make loans to public housing agencies of the several states or their political subdivisions with a view to assisting in the development, acquisition, or administration of low-rent housing or slum-clearance projects." (Ibid.)  To avail California of this federal funding, the state Legislature enacted the state Housing Authorities Law in 1938.  Stats. 1938, Ex. Sess., p. 9 (now codified at Cal.  Health & Saf. Code, §§ 34200-34380).

10.  Although every public housing authority (PHA) in California is established pursuant to the state Housing Authority Law, a PHA is not organized unless and until a county or city adopts a declaration of need. Cal. Health & Saf. Code, § 34240-44.   Once organized, a PHA is governed by a board of commissioners. Cal. Health & Saf. Code, §§  34270, 34271.  Elected officials may serve as PHA commissioners, Cal. Health & Saf. Code, § 34272, and city council members frequently serve as their City's PHA's commissioners.

11.  Public Housing Authorities exercise powers like those conferred on a state-sponsored or chartered corporation.  They can sue and be sued, and may transact any business consistent with their enabling legislation. Cal. Health & Saf. Code, §§ 34310-34311.  They can issue affordable housing bonds for the construction, purchase, or rehabilitation of affordable housing.  Cal. Health & Saf. Code, §§  34350.  But their principal source of funding is the federal government pursuant to one of several affordable housing programs administered by the United States Department of Housing and Urban Development (HUD).  Among

those federal programs, the Section 8 Voucher program is the most important.

**B.     The Section 8 Voucher Program.**

12.    The Section 8 program is named for Section 8 of the United States Housing Act, as amended.  The original Section 8 program, established by the Housing and Community Development Act of 1974 (P.L. 93-383), consisted of three parts: new construction, substantial rehabilitation, and existing housing certificates (similar to today's tenant vouchers).

13.    Since 1974, however, federal funding of housing has steadily moved away from subsidizing the construction of public housing and to tenant-based subsidies in the form of vouchers. In 1983, the new construction and substantial rehabilitation portions of the Section 8 program were repealed, replaced today by the Low Income Tax Credit program and HOPE IV program.   By 1998, with the enactment of the Quality Housing and Work Responsibility Act (P.L. 105-276), the transition to the current Section 8 Voucher program was largely completed. As currently configured, the Section 8 program funds PHAs to issue and administer tenant-based vouchers to low-income families.  HUD currently funds PHAs to administer more than 2.2 million Section 8 vouchers.  It is the largest affordable housing program in the United States.

14.    A Section 8 voucher – also referred to as Housing Choice Voucher (HCV)[1] – subsidizes a low-income family's rent payments to a private landlord.

---

[1] There are several subprograms administered by HUD that fund Section 8 vouchers targeting specific population in need of housing assistance, e.g., Veteran Affairs Supportive Housing (VASH) vouchers for homeless vets, and Family Unification Program (FUP) vouchers to assist families at risk of homelessness. Although eligibility for these special voucher types varies, they all operate in accordance with the same basic Section 8 HCV regulations promulgated by HUD. For consistency, HCV will be referred to as Section 8 vouchers in this complaint.

Under the Section 8 voucher program, low (below 80% of AMI[2]) and very low (below 50% of AMI) income families are eligible for HCV vouchers. 24 C.F.R. § 982.202  Each PHA establishes a "Payment Standard," which caps the rental rates that HUD will subsidize.  24 C.F.R. § 982.502-504.  The Payment Standard is set by the PHA between 90–110% of the Fair Market Rent (FMR), a ceiling set by HUD based on local market conditions.  24 C.F.R. § 982.503.  Generally, a Section 8 tenant is expected to pay 30-40% of her income for rent and the PHA pays the balance up to the Payment Standard. 24 C.F.R. §§ 982.503, 982.507-508.

15.   Section 8 vouchers are prized entitlements, especially in high-price rental markets like California.   To obtain an Section 8 voucher, a low-income family first must qualify for a spot on a PHA's waiting list; these lists are frequently closed to new families.  Nationally, the average wait time is 28 months; in California, a family typically waits 32 months before its application for Section 8 voucher is considered by a PHA.

16.   Once a PHA issues a Section 8 voucher to a family, the recipient must locate private-market housing renting for less than the Payment Standard within 60 days. 24 C.F.R. § 982.303.  If the voucher-holder finds suitable housing, the voucher-holder and prospective landlord sign and submit a Request for Tenancy Approval form to the PHA with a copy of the landlord's proposed one-year lease. 24 C.F.R. § 982.302.  That request triggers two actions by the PHA: First, it must review and approve the landlord's proposed one-year lease, 24 C.F.R. § 982.308; and second, it must conduct an  inspection of the rental dwelling to determine if it meets HUD's Housing Quality Standards, 24 C.F.R. § 982.305.  If a PHA approves the proposed lease and dwelling, then the PHA notifies the voucher-holder and prospective landlord that the tenancy will be subsidized by the PHA

---

[2]AMI means Area Median Income.  HUD surveys local areas to determine their median income and then uses that survey data as the yardstick to determine whether a family is sufficiently needy to qualify for a Section 8 voucher.

pursuant to a Housing Assistance Payments (HAP) contract, executed between the PHA and landlord.  The HAP contract is coterminous with the landlord's lease and establishes the essential terms of tenancy.  24 C.F.R. §§ 982.514-515.

17. HUD tightly regulates PHAs and Section 8 landlords though the use of standard, statutorily mandated contract forms. HUD and each PHA annually execute an Annual Contributions Contracts (Form HUD 53012A), 24 C.F.R. § 982.151, under which HUD agrees to fund the PHA's Section 8 voucher program and PHA agrees to comply with the United Stated Housing Act of 1937, HUD regulations, executive orders, and HUD-issued notices and forms. 24 C.F.R. §§ 982.52, 982.53.

18. HUD also mandates that each PHA and Section 8 landlord execute a standard, statutorily mandated HAP contract (Form HUD-52641), which consists of three parts. 24 C.F.R. §§ 982.451, 982.452.  Part A (Contract Information) specifies the dwelling address, initial lease term, and division of rent payments between the tenant and the PHA.  Part B (Body of Contract) specifies the terms between the PHA and landlord.  Part C (Tenancy Addendum) is a form annexed to the landlord's lease; its terms supersede the terms of the landlord's lease.  24 C.F.R. § 982.308.

**C.     Statutory Restrictions on the Termination of Section 8 Tenancies**

19. Under the United States Housing Act, HUD regulations, and the standard, mandatory HAP contract form, a landlord may terminate a Section 8 tenancy at any time, but only for a serious lease violation, commission of a crime, or "other good cause." 42 U.S.C. § 1437f(o)(7); 24 C.F.R. § 982.310(a).  "Other good cause" includes a Section 8 tenant's refusal to accept a new lease after expiration of her original, first-year lease term, a history of disturbances caused by the Section 8 tenant, and for certain valid business reasons, such as the "landlord's desire to use the unit for personal or family use," 24 C.F.R. § 982.310(d)(1).

20. But the right of a landlord to terminate a Section 8 tenancy for "other

good cause" is expressly limited during a Section 8 tenant's first year of occupancy:

> During the initial lease term, the owner may not terminate the tenancy for "other good cause," unless the owner is terminating the tenancy because of something the family did or failed to do. For example, during this period, the **owner may not terminate the tenancy for "other good cause" based on any of the following grounds: failure by the family to accept the offer of a new lease or revision; the owner's desire to use the unit for personal or family use**, or for a purpose other than as a residential rental unit; or a business or economic reason for termination of the tenancy.

24 C.F.R. § 982.310(d)(1); HAP Contract, Part C, Form HUD-52641 (emphasis added).

### D. Federal Requirements Mandating Fair Housing Compliance

21. PHAs are bound by law and contract to comply with federal fair housing laws. The United States Housing Act bars discrimination by PHAs. 42 U.S.C. 1437b. HUD regulations reinforce the Act's fair housing requirements. 24 C.F.R. Parts 2, 8, 982. The Annual Contribution Contract imposes additional fair housing requirements on PHAs. Form HUD-53012.

22. Section 8 landlords are also bound by law and contract to comply with fair housing laws. The standard, statutorily mandated HAP contract provides:

> Part B (Body of Contract), ¶ 9. Prohibition of Discrimination. In accordance with applicable equal opportunity statutes, Executive Orders, and regulations:
>
> a. The owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status, or disability in connection with the HAP contract. Eligibility for HUD's programs must be made without regard to actual or perceived sexual

        orientation, gender identity, or marital status.

        b. The owner must cooperate with the PHA and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract.

Form HUD-52641 at 6.

Part C (Tenancy Addendum), ¶ 16. Prohibition of Discrimination:

        In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease. Eligibility for HUD's programs must be made without regard to actual or perceived sexual orientation, gender identity, or marital status.

Form HUD-52641 at 12.

## IV.   FACTUAL ALLEGATIONS

### A.   HACM Issues a Section 8 Voucher to Chhang

23.   On June 30, 2022, the Housing Authority of the City of Madera (HACM) issued a Section 8 voucher to Pharilyn Chhang.

24.   In July 2022, defendant Sergio Madrigal approved Chhang's application as a Section 8 tenant to rent Apartment 7 at the Cypress Apartment. HACM notified Chhang and Madrigal that it approved Madrigal's proposed lease and the condition of Apartment 7. Chhang and Madrigal signed a one-year lease running from August 1, 2022 to July 31, 2023. Madrigal and Janet Moreno, an occupancy specialist employed by HACM, executed a HAP contract. The HAP contract specified the "initial lease term" as August 1, 2022 to July 31, 2023. Of the total monthly rent of $950 owed Madrigal, Chhang paid $520 and HAMC paid $430 pursuant to the HAP Contract.

///

///

### B. Madrigal Refuses Chhang's First Request for Reasonable Accommodation

25. On August 2, 2022, Chhang and Madrigal met to sign her lease for the rental of Apartment 7. Reviewing the lease, Chhang observed that the lease contained a no-pets rule. Chhang told Madrigal that she lived with Onyx, her assistance dog, and asked Madrigal to make an exception his no-pets rule. Madrigal refused and Chhang explained that she was disabled and that Onyx was necessary for her to use and enjoy her apartment. Chhang offered to provide Madrigal with medical verification of her disability and her need for Onyx. Madrigal asked Onyx's breed; Chhang answered that Onyx was a pit bull terrier. Madrigal replied that his insurance company prohibited him from renting to a tenant with a dog of that breed even if it were an assistance animal.

26. Desperate for permanent housing, Chhang signed Madrigal's lease and moved with her daughter into Apartment 7. Chhang placed Onyx with friends.

### C. Madrigal Refuses Chhang's Second Request for Reasonable Accommodation

27. On October 16, 2022, at 1:25 p.m., Chhang made her second request for a reasonable accommodation, texting Madrigal:

> Hi Sergio, this is Pharilyn at 121 Cypress Apt 7 in Madera. I wanted to ask you something and I know we talked about this on August 02nd, 2022 and I wanted to ask you again hoping that you would reconsider my request for a reasonable accommodation for my ESA. I had him kept at a friend house and would go there almost everyday to spend time with him but it's not helping me cope with depression because it has gotten worst without him! I need him with me and I have doctor signed letter to prove my conditions.

28. On that same day, starting at 3:24 p.m., Madrigal and Chhang

exchanged texts:

*Madrigal*: Sorry we cannot modify the lease. Please search for an apartment that will accommodate.

*Chhang*: The last time you said it was because of insurance reasons

*Madera*: That's exactly the reason why we can't modify the lease.

29. On October 17, 2022, Chhang renewed her second reasonable accommodation request to Madrigal in the form of a letter, entitled "To Housing Provider Requesting Emotional Support Animal," stating:

> I did a verbal request for reasonable accommodation for my emotional support animal at the time of move which was August 2nd, 2022 and you denied me verbally due to dog breed and insurance issues. Under the fair housing act, local and federal law. I am protected from discrimination. I am writing to request an (ESA) Emotional Support Animal as a reasonable accommodation for my disability/disabilities. I am requesting to be able to have my ESA. I am currently renting at your property on 121 Cypress Ave Apt 7 Madera Ca, 93637. Because of my disability, I need to keep an assistance animal as a reasonable accommodation. My physician and therapist have deemed this accommodation necessary in light of my disability. Please see the attached letter from Apai Polyudhapoom, MD. Federal and state law require that a housing provider reasonably accommodate tenants/occupants and applicants who have disabilities. Please respond to my request for reasonable accommodation.

30. Chhang attached a "medical certificate" to her letter, signed by Apai Polyudhapoom, MD, and dated October 13, 2022, stating:

> In order to help alleviate these difficulties and enhance her ability to function and live independently and to fully use and enjoy the dwelling unit you own or administer, I am prescribing an emotional support animal that will assist Pharilyn in coping with her disability. The presence of this

-10-

        emotional support animal is necessary for her mental health because its presence will mitigate the symptoms she is currently experiencing of chest palpitations and nervousness.

Dr. Polyudhapoom provided his contact information and invited calls to verify the contents of his certificate.

        31.    On October 18, 2022, Madrigal acknowledged Chhang's written reasonable accommodation request and asked Chhang to supply Madrigal with photographs of Onyx, which Chhang texted to Madrigal later that same date.

        32.    On October 25, 2022, Madrigal sent Chhang a letter, denying her second request for reasonable accommodation:

> We have contacted our Insurance Carrier and our Attorney to hopefully come up with a solution to accommodate your needs. In response to your request to have a Pit Bull on our property as a service animal, our Insurance Carrier have informed us that if we were to accommodate this request for you, they would no longer provide coverage to us. Our insurance provider stated that having a Pit Bull on the property is too much of a risk, therefore, excluded in our policy. Our Attorney states under The Federal Fair Housing Act that quote: "Landlords can refuse to allow certain companion animals if the animal will present undue hardship or expense for the landlord's business. An example of this is when a landlord's insurance company will raise rates or drop coverage for certain dog breeds to live on the property that are considered too aggressive, like pit bulls" unquote.

        **D.**    **Madrigal Notifies HACM of Denial of Chhang's Requests**

        33.    On October 26, Christina Quijano, Madrigal's property manager, emailed a copy of Madrigal's denial letter, dated October 25, to Jacqueline Velazquez and Janet Moreno, HAMC employees. Neither Velazquez nor Moreno advised Madrigal or Quijano that refusing Chhang's request may be a discriminatory housing practice.

**E.     Madrigal Refuses Chhang's Third Request for Reasonable Accommodation by Terminating Her Tenancy**

34.     On October 28, 2022, Chhang emailed Madrigal and Quijano, renewing her request:

> Denying my request for my assistance animal based on breed, size restrictions are prohibited I quote "including those imposed by insurance companies." unquote You are denying my animal based on stereotypes and not determined by a case-by-case basis. It is unlawful to have policies prohibiting pitbulls unless that particular pitbull was constantly growling at people and attempted to bite a tenant. I feel that your denying my assistance animal is in direct violation of my rights that are protected by state laws and federal laws. I will be filing a complaint with HUD for open discrimination of my disability.

35.     On November 2, 2022, at 10:37 a.m., Quijano replied to Chhang, emailing:

> We are doing our best to accommodate your request Ms. Chhang for the service animal. We have been notified in order to do this we will need the following documents from you. 1.  Proof of Renter's Insurance (Certificate of Insurance w/Liabiilty)  2.  Vaccine Records and Registry of your dog.  3. Proof of Therapy Training for your dog.

36.     On that same day at 4:35 p.m., Chhang replied by email to Quijano, explaining that Onyx was an "assistant animal" and stating:

> Service animals and emotional support animals fall under the same category as, "Assistant Animal," but unlike service animals that require training to do a specific task. An emotional support animal does not need specific training, except to be under the control of the handler and have basic obedient skills. I have proof of Rabies shot record and a dog license required by the city of

1    Madera. . . . As far as renters insurance, registry, and training those are not
2    something I have to have in order to live with my assistant animal. That
3    ESA letter from my Physician is all that is required.
4 Chhang attached a copy of Onyx's vaccination record and his city dog license to
5 her email.
6    37.    Neither Madrigal nor Quijano responded directly to the information
7 provided by Chhang.  Instead, on November 5, 2022, Madrigal mailed a 60-day
8 notice to Chhang terminating her tenancy.   The notice stated no reason for the
9 termination but threatened Chhang:
10   If you fail to quit and deliver possession, legal proceedings will be instituted
11   against you to obtain possession and such proceedings could result in a
12   judgment against you which may include attorneys' fees and court costs as
13   allowed by law, plus the Landlord may recover an additional punitive award
14   of six hundred dollars ($600) in accordance with California law for such
15   unlawful detention. This legal action will also result in forfeiture of the
16   rental agreement.
17   **F.    HACM Fails to Advise Madrigal that His Termination of**
18   **Chhang's Tenancy Is Invalid**
19   38.    On November 4 – the day before Madrigal served the 60-day notice –
20 Quijano notified HACM employees, Janet Moreno and Jacqueline Velazquez, via
21 email:
22   I am attaching the notices that we sent out to Ms. Chhang. **The owner's son**
23   **is in need of a place to live and he will be living in that unit so we have**
24   **prepared the necessary forms for Ms. Chhang under the advisement**
25   **from our Attorney.** The owner will waive her rent from December 5th -
26   January 5th, providing that Ms. Chhang vacates the property as described in
27   the notices.  Please be advised, if Ms. Chhang refuses to leave under any
28   circumstance, then we will have our Attorney further handle the process.

Quijano attached a notice to her email entitled, *Notice of Termination of Tenancy Due To Owner Move-In*.

39. In response to that email, neither Moreno nor Velazquez advised Quijano or Madrigal that termination of Chhang's tenancy so that Madrigal's son could occupy Apartment 7 was expressly forbidden under the law governing the Section 8 program and Madrigal's HAP contract during the initial, one-year lease period.

40. Instead, on November 8, at 2:13 p.m., Moreno emailed Quijano:
> The notice I received was a 30-day notice. Will we be moving forward with a 30-day notice due to your cause or a 90-day notice with no cause?

41. On November 9, Quijano replied, emailing Moreno and Velazquez:
> We were advised to serve her a 90 day notice. She filed a complaint with HUD, they called us and explained that we need to serve her the 90 day. We sent it out to her yesterday by certified mail. Attached is the copy of what we sent to Ms. Chhang.  She will need to vacate the unit by February 8, 2023.

Quijano attached the new 90-day notice served on Chhang, entitled *Ninety Day Notice of Termination of Tenancy Due to Owner Move ln*, which came with a cover letter stating:
> We received a phone call today from your HUD case worker and she has advised us to provide you with a Ninety Day Notice of Termination of Tenancy Due To Owner Move-In. During this time, you will be allowed to have your service animal. We have also been in contact with the Madera Housing Authority and have let them know of the changes made and that your lease will end on February 8, 2023.

42. In response to that email, neither Moreno nor Velazquez advised Quijano or Madrigal that termination of Chhang's tenancy due to owner move in was expressly forbidden under the law governing the Section 8 program and

-14-

Madrigal's HAP contract during the initial, one-year lease period.

### G. Chhang Asks HACM for Help and Ends Up Homeless

43. On November 8, 2022, Chhang call HACM asking for help in responding to Madrigal's notices terminating her tenancy. Moreno logged the Chhang's call in HACM's database and Velazquez referred Chhang to CRLA, the legal aid program serving Madera. Neither Moreno nor Velazquez advised Chhang that the basis for Madrigal's termination notices was invalid. Instead, HACM affirmed that Chhang's tenancy in Apartment 7 would be terminated on February 8 and indicated that Chhang could leave Madera by transferring her voucher to another county or state.

### H. Chhang Is Homeless and Moves to Fresno

44. Chhang vacated Apartment 7 by February 8 and put her and her daughter's belonging into storage in Madera. The family then moved to Fresno, where Chhang and her daughter were homeless until April 25, 2023.

### I. Defendants Injured Chhang Entitling Her to Relief

45. As a result of defendants' unlawful housing practices alleged herein, Chhang suffered injury, including emotional distress, humiliation, embarrassment, stress, and attendant bodily injuries. Chhang also suffered violation of her housing rights, wrongful eviction, breach of quiet enjoyment, invasion of her right of private occupancy, and loss of important housing opportunities. Accordingly, Chhang is entitled to compensatory damages.

46. Each defendant acted – or knowingly ratified or condoned actions – that recklessly disregarded Chhang's rights or that were committed with malice, oppression, or fraud. Accordingly, Chhang is entitled to punitive damages.

47. There now exists an actual controversy between the parties regarding defendants' duties under federal and state fair housing laws. Accordingly, Chhang is entitled to declaratory relief.

48. Unless enjoined, defendants will continue to engage in the unlawful

housing practices alleged in this complaint. Chhang does not have a complete remedy at law and suffers and will continue to suffer irreparable injury unless defendants, and each of them, are enjoined. Accordingly, Chhang is entitled to injunctive relief.

## V. CLAIMS

### A. First Claim: Federal Fair Housing Act
*[Plaintiff v. All Defendants]*

49. Plaintiff realleges and incorporates herein by reference each preceding paragraph.

50. Each defendant, directly or vicariously through its agents, employees, or contractors, is liable for the commission of the following discriminatory housing practices in violation of the Fair Housing Act:

    a. Discriminating in the rental, or to otherwise making unavailable or denying, a dwelling to renter because of disability, 42 U.S.C. § 3604(f)(1);

    b. Discriminating against any person in the terms, conditions, or privileges of rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of disability, 42 U.S.C. § 3604(f)(2);

    c. Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling, 42 U.S.C. § 3604(f)(3)(B); and,

    d. Interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed any right granted or protected by Fair Housing Act, 42 U.S.C. § 3617.

51. Plaintiff was injured as a result of the discriminatory housing practices for which each defendant is liable, 24 C.F.R. § 100.7; accordingly, plaintiff is an aggrieved person, 42 U.S.C. § 3602(i), entitled to relief, 42 U.S.C. §

3613.

## B. Second Claim: Civil Rights Act of 1871
*[Plaintiff v. HACM only]*

52.  Plaintiff realleges and incorporates by reference each preceding paragraph herein.

53.  Defendant Housing Authority of the City of Madera injured plaintiff by depriving her of the protection afforded under federal statutes, including the United States Housing Act of 1937, as amended, 42 U.S.C. § 1437f(o)(7), 24 C.F.R. Part 982, entitling plaintiff relief pursuant to the Civil Rights Act of 1871, 42 U.S.C.§§ 1983, 1986, and 1988.

## C. Third Claim: California Fair Employment and Housing Act
*[Plaintiff v. All Defendants]*

54.  Plaintiff realleges and incorporates herein by reference each preceding paragraph.

55.  Each defendant, directly or vicariously through its agents, employees, or contractors, is liable for the commission of the following discriminatory housing practices in violation of the Fair Employment and Housing Act:

    a. Discriminating in the rental of a dwelling to renter because of disability, Cal. Govt. Code §§ 12927(c), 12955(a) and 12955(d);

    b. Aiding, abetting, or inciting each defendant to commit a discriminatory housing practice, Cal. Govt. Code §§ 12955(g);

    c. Making unavailable or otherwise denying a dwelling because of disability, Cal. Govt. Code §§ 12955(k);

    d. Discriminating through land use practices, decisions, or authorizations, that make housing opportunities unavailable because of disability, Cal. Govt. Code §§ 12955(l);

    e. Interfering with the exercise or enjoyment of state fair housing rights, Govt. Code § 12955.7; and,

1       f.     Refusing requests for a reasonable accommodation, Cal. Govt. Code

2           §§ 12926, 12926.1, 12927, 12955, and 12955.3.

3     56.    Plaintiff was injured as a result of the discriminatory housing

4 practices for which each defendant is liable, Cal. Govt. Code § 12955.6;

5 accordingly, plaintiff is an aggrieved person, Govt. Code § 12927(g), and entitled

6 to relief, Govt. Code §§ 12989.1, 12989.2.

### C. Third Claim: Wrongful Eviction

*[Plaintiff v. All Defendants]*

9     57.    Plaintiff realleges and incorporates by reference each preceding

10 paragraph herein.

11     58.    Each defendant, directly or vicariously through its agents, employees,

12 or contractors, is liable for making threats constituting a course of conduct –

13       a.    that interfered with plaintiff's quiet enjoyment of her dwelling in

14           violation of Section 1927; and

15       b.    that created a reasonable apprehension of harm in plaintiff

16 – in violation of Cal. Civ. Code § 1940.2(a)(3).

17     59.    Plaintiff was injured by defendants' violation of  Cal. Civ. Code §

18 1940.2; accordingly, she is an aggrieved person entitled to relief under Cal. Civ.

19 Code § 1940.2(b), including civil penalties.

### D. Fourth Claim: Breach of Quiet Enjoyment

*[Plaintiff v. All Defendants]*

22     60.    Plaintiff realleges and incorporates by reference each preceding

23 paragraph herein.

24     61.    Each defendant, directly or vicariously through its agents, employees,

25 or contractors, is liable for breaching the plaintiff's quiet enjoyment in violation of

26 Cal. Civ. Code § 1927, including invasion of plaintiff's private right of occupancy.

27     62.    Plaintiff was injured as a result of defendants' misconduct;

28 accordingly, she is an aggrieved person entitled to relief pursuant to Cal. Civ.

Code §§ 3281 and 3333.

## E.  Fifth Claim:  Breach of Duty
### *[Plaintiff v. All Defendants]*

63. Plaintiff realleges and incorporates by reference each preceding paragraph herein.

64. Each defendant, directly or vicariously through its agents, employees, or contractors, is liable for breaching its duties of care in the operation and management of its rental dwelling or public housing authority in violation Cal. Civ. Code § 1714.

65. Plaintiff was injured by defendants' breaches of duties; accordingly, she is an aggrieved person entitled to relief pursuant to Cal. Civ. Code §§ 3281 and 3333.

## VI.  PRAYER FOR RELIEF

Therefore, plaintiff prays for entry of a judgment:

1. That declares that each defendant engaged in unlawful acts or practices in violation of federal and state statutes invoked in this complaint;

2. That enjoins each defendant, including his partners, agents, employees, assignees, and all persons acting in concert or participating with him, from committing any of the unlawful acts or practices alleged in this complaint or proven in this action;

3. That requires each defendant, including his partners, agents, employees, assignees, and all persons acting in concert or participating with him, to undertake affirmative steps to remedy the effects of the unlawful acts or practices alleged in this complaint or proven in this action;

4. That awards compensatory damages to plaintiff, according to proof;

5. That awards punitive damages to plaintiff, according to proof;

6. That awards statutory damages or civil penalties, as provided by statute;

1  7. That awards attorneys' fees, costs, and expenses to plaintiff; and,

2  8. That grants all such additional relief to which plaintiff is entitled.

3  Dated: September 7, 2023.

Respectfully submitted,

BRANCART & BRANCART

*/s/ Christopher Brancart*
Christopher Brancart
cbrancart@brancart.com
Liza Cristol Deman
lcristoldeman@brancart.com
Post Office Box 686
Pescadero, CA 94060
Tel: (650) 879-0141

Attorneys for Plaintiffs