1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHARILYN CHHANG, | Case No. 1:23-cv-01335-SAB |
| Plaintiff, | ORDER GRANTING DEFENDANT HOUSING AUTHORITY OF THE CITY OF MADERA'S MOTION TO DISMISS |
| v. | |
| WEST COAST USA PROPERTIES LLC, et al., | (ECF Nos. 32, 37, 39) |
| Defendants. | |

## I.

## INTRODUCTION

Currently before the Court is Defendant Housing Authority of the City of Madera's ("HACM") motion to dismiss Plaintiff's first amended complaint. A hearing on the motion was held on April 3, 2024. (ECF No. 45.) Christopher Brancart and Baldwin Moy appeared on behalf of Plaintiff via video. Alison Flowers appeared on behalf of Defendant HACM via video. Michael Titus appeared on behalf of Defendants Sergio Madrigal and West Coast USA Properties LLC. Having considered the moving, opposition and reply papers, the exhibits attached thereto, the arguments presented at the hearing, as well as the Court's file, the Court issues the following order granting HACM's motion to dismiss without leave to amend.

/ / /

/ / /

1

**II.**

**BACKGROUND**

Pharilyn Chhang ("Plaintiff") filed the operative first amended complaint in this action on January 21, 2024.  (First Am. Compl. ("FAC"), ECF No. 24.)  Plaintiff names the following Defendants: (1) West Coast USA Properties LLC ("West Coast"), identified as a California limited liability company that holds title to the Cypress Apartments located at 121 Cypress Street in Madera, California; (2) Sergio Madrigal, identified as the managing member, agent, and chief executive officer of West Coast and landlord in the instant matter; and (3) HACM, identified as the public housing authority that issued a Section 8 voucher to Plaintiff and executed a Housing Assistance Payments ("HAP") contract with Madrigal.  (FAC ¶¶ 5-7, 21-22.)

**A.    Factual Allegations**

On June 30, 2022, HACM issued a Section 8 voucher to Plaintiff.  (FAC ¶ 22.)  In July 2022, Defendant Madrigal approved Plaintiff's application as a Section 8 tenant to rent an apartment at the Cypress Apartments.  (FAC ¶ 23.)  HACM notified Plaintiff and Madrigal that it approved the proposed lease and the condition of the apartment.  (Id.)  Plaintiff and Madrigal signed a one-year lease running from August 1, 2022 to July 31, 2023.  (Id.)  Madrigal and Janet Moreno, an occupancy specialist employed by HACM, then executed a HAP contract.  (Id.)

On August 2, 2022, Plaintiff met with Madrigal and observed the lease contained a rule prohibiting pets.  (FAC ¶ 24.)  Plaintiff told Madrigal that she lived with her emotional support ("ESA") dog, Onyx, and requested an exception.  (Id.)  When Madrigal refused, Plaintiff explained she was disabled, and that Onyx was necessary for her use and enjoyment of the apartment.  (Id.)  Plaintiff offered to provide Madrigal with medical verification of her disability and her need for Onyx, a pit bull terrier.  (Id.)  Madrigal told Plaintiff that the property's insurance carrier prohibited him from renting to a tenant with a dog of Onyx's breed, even if it was an ESA.  (Id.)  Plaintiff signed the lease, moved into the apartment, and placed Onyx with friends.  (FAC ¶ 25.)

On October 16, 2022, Plaintiff asked that Madrigal reconsider her request for a reasonable accommodation.  (FAC ¶ 26.)  Plaintiff texted Madrigal that her depression had

1  gotten worse without Onyx and she needed Onyx with her.  (Id.)  Plaintiff informed Madrigal she

2  had a letter from a doctor.  (Id.)  Madrigal told Plaintiff that the lease could not be modified for

3  insurance reasons and advised she search for an apartment that would accommodate. (FAC ¶ 27.)

4          On October 17, 2022, Plaintiff renewed her request for reasonable accommodation via

5  letter, which stated she was protected from discrimination "[u]nder the fair housing act, local,

6  and federal law," and requested her ESA as a reasonable accommodation for her disability.

7  (FAC ¶ 28.)  Plaintiff attached a medical certificate from a doctor, dated October 13, 2022,

8  which prescribed an ESA for Plaintiff's unspecified disability.  (FAC ¶ 29.)  The letter stated an

9  ESA was necessary for Plaintiff's mental health because its presence would mitigate her

10  symptoms.  (Id.)

11         On October 18, 2022, Madrigal acknowledged Plaintiff's written request for reasonable

12  accommodation and requested photographs of Onyx, which Plaintiff provided.  (FAC ¶ 30.)

13         On October 25, 2022, Madrigal sent Plaintiff a letter, denying her request for a

14  reasonable accommodation.  (FAC ¶ 31.)  Therein, Madrigal advised Plaintiff they had contacted

15  the insurance carrier and an attorney to come up with a solution and accommodate Plaintiff's

16  needs.  (Id.)  However, the insurance carrier advised it would not provide coverage if Plaintiff's

17  request was accommodated because having a pit bull on the property is too much of a risk and is

18  excluded in the policy.  (Id.)  Madrigal also relayed that an attorney advised him that under the

19  Federal Fair Housing Act, landlords can refuse to allow certain companion animals if the animal

20  would present undue hardship or expense for the landlord's business; for example, when an

21  insurance company would raise rates or drop coverage for certain dog breeds.  (Id.)

22         On October 26, 2022, Christina Quijano, Madrigal's property manager, emailed a copy of

23  Madrigal's denial letter to HACM employees, Moreno and Jacqueline Velazquez.  (FAC ¶ 32.)

24         On October 28, 2022, Plaintiff renewed her request to Madrigal via email and advised

25  that she would be filing a complaint with the United States Department of Housing and Urban

26  Development ("HUD") for "open discrimination of [her] disability."  (FAC ¶ 33.)

27         On November 2, 2022, Quijano advised Plaintiff they were doing their best to

28  accommodate the request and asked for proof of renter's insurance, vaccine records and registry,

and proof of therapy training for Onyx.  (FAC ¶ 34.)  In response, Plaintiff informed Quijano that ESAs must have basic obedience skills but do not require specific training.  (FAC ¶ 35.) Plaintiff attached a copy of Onyx's vaccination record and license and advised that the ESA letter from her physician was the only required document.  (Id.)

Plaintiff alleges neither Madrigal nor Quijano directly responded to the information provided.  (FAC ¶ 36.)  Instead, on November 5, 2022, Madrigal mailed a sixty-day notice to Plaintiff terminating her tenancy without stating a reason, but threatening legal proceedings if Plaintiff did not quit and deliver possession of the premises.  (Id.)

On November 4, 2022, Quijano notified Moreno and Velazquez via email that "[t]he owner's son is in need of a place to live and he will be living in [Plaintiff's] unit so we have prepared the necessary forms for [Plaintiff] under the advisement from our Attorney."  (FAC ¶ 37.)  Quijano attached a notice to her email entitled, "Notice of Termination of Tenancy Due To Owner Move-In."  (Id.)

On November 8, 2022, Moreno and Quijano exchanged emails regarding the length of notice provided to Plaintiff, and Quijano stated that HUD advised that they give a ninety-day notice, and attached the new notice served on Plaintiff, entitled, "Ninety Day Notice of Termination of Tenancy Due to Owner Move-In."  (FAC ¶¶ 39-40.)  Quijano also provided a cover letter, which advised Plaintiff that HACM had been notified of the changes and that Plaintiff's lease would end on February 8, 2023.  (FAC ¶ 40.)

On November 8, 2022, Plaintiff called HACM for help in responding to the notices terminating her tenancy.  (FAC ¶ 42.)  Moreno logged the call in HACM's database and Velazquez referred Plaintiff to a legal aid program.  (Id.)  Plaintiff vacated the apartment by February 8, 2023, and she and her daughter were homeless until April 25, 2023.  (FAC ¶ 43.)

**B.    Procedural History**

Plaintiff filed this action on September 7, 2023.  (ECF No. 1.)  On December 1, 2023, Defendants Madrigal and West Coast filed an answer.  (ECF No. 9.)  On January 10, 2024, HACM filed a motion to dismiss.  (ECF Nos. 17, 18, 19.)  In a January 18, 2024 joint report, the parties informed the Court that Plaintiff would be filing an amended complaint.  (ECF No. 23 at

1   2.)  On January 21, 2024, Plaintiff filed the first amended complaint, alleging seven causes of

2   action: violations of the Fair Housing Act and the California Fair Employment and Housing Act

3   against all Defendants; violation of the Americans with Disabilities Act and Rehabilitation Act

4   against HACM only; and claims for wrongful eviction, invasion of private right of occupancy,

5   and breach of duty against West Coast and Madrigal only.  (FAC at 18-24.)  On February 2,

6   2024, Madrigal and West Coast answered the first amended complaint.  (ECF No. 31.)

7            On February 5, 2024, HACM filed the instant motion to dismiss each of Plaintiff's causes

8   of action against HACM pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Def. HACM's

9   Mot. Dismiss ("Mot."), ECF No. 32-1.)  HACM also filed a request for judicial notice.  (Def.

10  HACM's Req. Jud. Not. ("DRJN"), ECF No. 32-2.)  On March 6, 2024, Plaintiff filed her

11  opposition (Pl's Opp'n Mot. ("Opp'n"), ECF No. 37) and a request for judicial notice (Pl's Req.

12  Jud. Not. ("PRJN"), ECF No. 37-1).  On March 13, 2024, HACM filed its reply.  (Def. HACM's

13  Reply Opp'n ("Reply"), ECF No. 39.)

14           On March 15, 2024, the Court granted the parties' stipulated motion to continue the

15  hearing to April 3, 2024.  (ECF No. 42.)  The Court held the hearing on April 3, 2024 and took

16  the matter under submission.  (ECF No. 45.)

17                                              **III.**

18                                    **LEGAL STANDARD**

19           Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on

20  the grounds that a complaint "fail[s] to state a claim upon which relief can be granted."  A

21  motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Navarro

22  v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  In deciding a motion to dismiss, "[a]ll allegations

23  of material fact are taken as true and construed in the light most favorable to the nonmoving

24  party."  Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337–38 (9th Cir. 1996).  The pleading

25  standard under Rule 8 does not require " 'detailed factual allegations,' but it demands more than

26  an unadorned, the-defendant-unlawfully-harmed-me accusation."  Ashcroft v. Iqbal, 556 U.S.

27  662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In

28  assessing the sufficiency of a complaint, all well-pleaded factual allegations must be accepted as

1    true.  Iqbal, 556 U.S. at 678-79.  However, "[t]hreadbare recitals of the elements of a cause of

2    action, supported by mere conclusory statements, do not suffice."  Id. at 678.  To avoid a

3    dismissal under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that

4    is plausible on its face."  Twombly, 550 U.S. at 570.

5         In deciding whether a complaint states a claim, the Ninth Circuit has found that two

6    principles apply.  First, to be entitled to the presumption of truth the allegations in the complaint

7    "may not simply recite the elements of a cause of action but must contain sufficient allegations

8    of underlying facts to give fair notice and to enable the opposing party to defend itself

9    effectively."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).  Second, so that it is not unfair

10   to require the defendant to be subjected to the expenses associated with discovery and continued

11   litigation, the factual allegations of the complaint, which are taken as true, must plausibly

12   suggest an entitlement to relief.  Starr, 652 F.3d at 1216.  "Dismissal is proper only where there

13   is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable

14   legal theory."  Navarro, 250 F.3d at 732 (citing Balistreri v. Pacifica Police Dept., 901 F.2d 696,

15   699 (9th Cir. 1988)).

16                                          **IV.**

17                                      **DISCUSSION**

18        HACM moves to dismiss each of Plaintiff's four discrimination claims under the Fair

19   Housing Act ("FHA"), California's Fair Employment and Housing Act ("FEHA"), the

20   Americans with Disabilities Act ("ADA"), and the Rehabilitation Act for failure to state a claim

21   pursuant to Rule 12(b)(6).  For the following reasons, the Court grants HACM's motion.

22        **A.      Requests for Judicial Notice**

23        HACM requests that the Court take judicial notice of two documents: a form Annual

24   Contributions Contract ("ACC") (DRJN at 3-16) and a form HAP contract.  (DRJN at 17-30.)

25   Plaintiff does not oppose the request.  Both documents are promulgated by HUD.  (Id. at 2.)  The

26   Court notes both form documents are available on HUD's website.[1]  Courts may take judicial

27   _____

28   [1] See Dep't of Housing & Urban Dev., ACC, https://www.hud.gov/sites/dfiles/OCHCO/documents/53012.pdf;
     Dep't of Housing & Urban Dev., HAP Contract, https://www.hud.gov/sites/dfiles/OCHCO/documents/52641ENG.pdf.

notice of information displayed on government websites where neither party disputes the accuracy of the information contained therein.  See Corrie v. Caterpillar, Inc., 503 F.3d 974, 978 n.2 (9th Cir. 2007) (taking judicial notice of government-published documents); United States ex rel. Jenkins v. Sanford Cap., LLC, No. CV 17-239, 2020 WL 5440551, at *5 (D.D.C. Sept. 10, 2020) (taking judicial notice of a form HAP contract as part of a motion to dismiss given, in part, the form guarantees that the relevant wording was not altered, and the form contract is posted on the official public website of a government agency).  Accordingly, the Court grants HACM's request for judicial notice.

Plaintiff requests that the Court take judicial notice of two documents: Form HUD-50077-CR Civil Rights Certification (PRJN at 4-5) and Form-HUD-50077-CR Civil Rights Certification (PRJN at 6-7).  HACM does not oppose the request.  The Court notes both certifications are form documents that are available on HUD's website.[2]  For the same reasons it granted HACM's request, the Court grants Plaintiff's request for judicial notice.

**B.      The Section 8 Housing Program**

While HUD funds the Section 8 federal housing subsidy program, the program is administered by local housing authorities.  See 42 U.S.C. § 1437(f); 24 C.F.R. §§ 982.151, 982.51.  Families therefore apply for Section 8 vouchers directly from their local public housing authority ("PHA") rather than HUD.  Id. § 982.201.  To facilitate funding from HUD to the PHA, the PHA and HUD execute a written ACC wherein HUD agrees to make payments to the PHA, over a specified term, for housing assistance payments to owners.  24 CFR § 982.151; see also id. § 982.162(a)(1).

When an applicant family is selected and is issued a Section 8 voucher by the PHA, the family has a specified timeframe to search for a unit where the owner is willing to lease under the program.  Id. § 982.302.  When the family finds a unit, the family must submit to the PHA a request for approval of the tenancy and a copy of the lease.  Id.  The PHA then determines

---

[2] See Dep't of Housing & Urban Dev., HUD-50077-CR (2/2013), https://www.hud.gov/sites/documents/HUD-50077-CR-2-10.PDF; Dep't of Housing & Urban Dev., Form-HUD-50077-CR (3/31/2024), https://www.hud.gov/sites/dfiles/OCHCO/documents/50077-CR.docx.

whether the prospective tenancy meets program requirements.  Id. § 982.305.  After the PHA has inspected the unit, the owner and tenant have executed a lease, and the PHA has approved the leasing of the unit in accordance with program requirements, the PHA notifies the family the assisted tenancy is approved.  Id.

The PHA and owner negotiate and execute a HAP contract, which is a separate and distinct contract from the lease executed between the owner and tenant.  Quillinan v. Papavassiliou, No. C 12-04159 CRB, 2013 WL 428604, at *1 n.3 (N.D. Cal. Feb. 1, 2013); see also 42 U.S.C. § 1437f(c); 24 C.F.R. § 982.162(a) ("The PHA must use program contracts and other forms required by HUD headquarters, including ... [t]he HAP contract between the PHA and the owner; and ... [t]he tenancy addendum.... Required program contracts and other forms must be word-for-word in the form required by HUD"); id. § 982.451.  The HAP contract has three parts: Part A details the tenant, lease, and unit; Part B is the body of the contract which specifies the terms between the PHA and owner; and Part C includes the tenancy addendum, which is a form attached to the owner's lease.  See 42 C.F.R. 982.308(f); DRJN at 17-30.

### C.    Plaintiff's Disability Discrimination Claims Against HACM

HACM argues it is an improper defendant in this action because it does not own, manage, or operate the apartment, did not engage in any discriminatory conduct against Plaintiff, and cannot be held liable for West Coast and Madrigal's alleged discriminatory conduct.[3]  Plaintiff alleges HACM is liable because it failed to take corrective action against Madrigal for his alleged discriminatory acts.  Plaintiff's discrimination claims against HACM therefore turn on whether a PHA that administers the Section 8 program but does not otherwise manage the property or engage in the alleged discriminatory conduct, owes a duty or obligation to the Section 8 tenant to affirmatively take corrective action against a private owner for his alleged discriminatory acts.  The Court addresses HACM's arguments that Plaintiff fails to state any legal duty under the (1) FHA, (2) FEHA, and (3) ADA and the Rehabilitation Act in turn.

///

---

[3] Because Madrigal is the managing member, agent, and chief executive officer of Defendant West Coast, the Court hereinafter only refers to Defendant Madrigal unless otherwise designated.

1      1.    The FHA Claim

2      Under the FHA, it is unlawful "[t]o discriminate in the sale or rental, or to otherwise

3  make unavailable or deny, a dwelling to any buyer or renter because of a handicap[.]"  42 U.S.C.

4  § 3604(f)(1).  The FHA also makes it unlawful to discriminate against any person "in the terms,

5  conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

6  in connection with such dwelling, because of a handicap of" the renter.  42 U.S.C. § 3604(f)(2).

7  The FHA further states that discrimination includes "a refusal to make reasonable

8  accommodations in rules, policies, practices, or services when such accommodations may be

9  necessary to afford such person equal opportunity to use and enjoy a dwelling[.]"  42 U.S.C. §

10  3604(f)(3)(B).  A plaintiff alleging a claim for failure to accommodate must show: (1) the

11  existence of a covered handicap; (2) the defendant's actual or constructive knowledge of that

12  handicap; (3) that an accommodation may be necessary; (4) that the accommodation is

13  reasonable; and 5) that the defendant refused to make the necessary and reasonable

14  accommodation upon request.  Salisbury v. City of Santa Monica, 998 F.3d 852, 857–58 (9th

15  Cir. 2021) (quotation omitted).

16      The FHA also makes it unlawful to "coerce, intimidate, threaten, or interfere with any

17  person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on

18  account of his having aided or encouraged any other person in the exercise or enjoyment of, any

19  right granted or protected by [the Fair Housing Act]."  42 U.S.C. § 3617.  To state a claim for

20  retaliation under the FHA, a plaintiff must allege (1) she engaged in a protected activity, (2) an

21  adverse housing consequence is casually linked to that activity and (3) there was resulting

22  damage.  San Pedro Hotel Co., Inc. v. City of Los Angeles, 159 F.3d 470, 477 (9th Cir. 1998).

23      Plaintiff avers HACM is subject to the FHA and may be held liable for injuries sustained

24  by Plaintiff.  (Opp'n 4-5.)  HACM does not dispute it is subject to the FHA.  (Reply 2.)  Rather,

25  HACM argues it cannot be held liable for Madrigal's alleged discriminatory acts in the instant

26  action.  (Reply 2-3.)  HACM argues it neither owns, manages, or operates the property at issue

27  nor did it engage in any discriminatory conduct.  (Mot. 10.)  HACM emphasizes that the factual

28  allegations against HACM within the FAC are limited: (1) HACM issued the Section 8 voucher

1   (FAC ¶ 22); (2) HACM employees *failed to advise* Madrigal that refusing Plaintiff's request for

2   alleged reasonable accommodation may be a discriminatory housing practice prohibited under

3   the HAP contract (FAC ¶ 32); (3) HACM employees *failed to advise* Madrigal that early

4   termination of Plaintiff's tenancy so Madrigal's son could occupy the apartment was prohibited

5   under the HAP contract and regulations governing the Section 8 program (FAC ¶ 38); and (4)

6   when Plaintiff called HACM asking for help in responding the Madrigal's termination notices,

7   HACM employees *failed to advise* Plaintiff that the basis for the notices was invalid (FAC ¶ 42).

8   (Mot. 10.)   Based on these allegations, HACM avers it did not engage in any discriminatory

9   conduct and it had no legal duty or obligation to compel Madrigal—a private landlord whose

10   actions HACM argues it has no control over—to comply with the law.  (Id.)

11           Plaintiff argues the FAC plausibly states a claim against HACM under the FHA because

12   she alleges that Madrigal—not HACM—terminated her tenancy and restricted her housing

13   choice because of her disability; refused to make reasonable accommodations to the no-pets rule

14   when such accommodation may be necessary to afford Plaintiff an equal opportunity to use and

15   enjoy her dwelling; and interfered with or retaliated against Plaintiff on account of her requesting

16   a reasonable accommodation.  (Opp'n 11-12 (citing FAC ¶¶ 22-49).)  Plaintiff argues HACM is

17   liable because the HAP contract and ACC conferred "obligations, powers, and authority" on

18   HACM to correct Madrigal's alleged discriminatory housing practices; the FHA and its

19   implementing regulations imposed a duty on HACM to exercise those "powers"; and HACM

20   failed to exercise any of those powers.  (Opp'n 12.)[4]

21           The FHA's implementing regulations clearly provide that a voucher participant is not a

22   party to or a third-party beneficiary of the HAP contract, nor should the "HAP contract ... be

23   construed as creating any right of the family ... to enforce any provision of the HAP contract or

24

---

25   [4] Plaintiff generally alleges that HACM is "directly and vicariously liable" under the FHA, FEHA, ADA, and
     Rehabilitation Act.  (FAC ¶¶ 51, 54, 58, 62.)  However, Plaintiff does not argue vicarious liability in her briefing,

26   nor does she otherwise allege that a principal-agent, landlord-tenant, employer-employee, or other similar
     relationship existed between HACM and Madrigal such that HACM is vicariously liable for Madrigal's conduct.  As

27   discussed at length below, Plaintiff only argues HACM is directly liable under 24 C.F.R. 100.7(a)(1)(iii).  Plaintiff
     does not argue HACM is vicariously liable under 24 C.F.R. 100.7(b).  The Court finds Plaintiff failed to allege
     sufficient facts to establish that HACM is vicariously liable for Madrigal's alleged discriminatory housing practices

28   under the FHA, FEHA, ADA, and Rehabilitation Act.

assert any claim against HUD, the PHA or the owner under the HAP contract."  24 C.F.R. § 982.456 (emphasis added).  The HUD-required form HAP contract incorporates this regulation through a clause that expressly excludes third party rights: "The family is not a party to or third party beneficiary of Part B of the HAP contract.  The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B." (DRJN at 24 ¶ 12.)  Similarly, the HUD-required form ACC expressly prohibits the creation of any enforcement right in a third party: "Nothing in this ACC shall be construed as creating any right of any third party to enforce any provision of the ACC, the CACC, or to assert any claim against HUD or the [P]HA."  (See DRJN at 16 ¶ 19 (emphasis added).)

Plaintiff maintains she is not seeking to enforce the terms of the ACC, which was executed by HUD and HACM, or the terms of the HAP contract, which was executed by Madrigal and HACM.  (Opp'n 7.)  Rather, she avers the "obligations, powers and authority" that the ACC and HAP contracts confer on HACM are "directly related and proportional to HACM's liability under [the FHA]…."  (Opp'n 7, 12.)  Thus, Plaintiff's theory of direct liability against HACM is that the ACC and HAP contracts authorize HACM to exercise several "powers" and HACM had the duty to exercise those "powers" pursuant to FHA regulations when it learned of Madrigal's allegedly discriminatory conduct.  (Opp'n 12.)  The Court first addresses the purported powers conferred to HACM under the ACC, Civil Rights Certification, and HAP contract, then turns to whether HACM had any legal duty to exercise those powers.

Plaintiff points out that the ACC requires that HACM comply with the implementing HUD regulations (DRJN at 5, ¶ 3(b)) and civil rights, equal opportunity, and nondiscrimination statutes including the FHA, ADA, and Rehabilitation Act (id. at 15, ¶ 17(a)).  Plaintiff also relies on the obligations provided in the form Civil Rights Certification, wherein HACM annually certifies it will "carry out the public housing program of the agency in conformity with [the FHA, ADA, and Rehabilitation Act]" and would "affirmatively further fair housing" through various methods.  (PRJN at 5; see id. at 7.)[5]  Plaintiff argues that the "carry out" requirement

---

[5] The Court notes the PHA's obligation to "affirmatively further[] fair housing" means "taking meaningful actions that, taken together, address significant disparities in housing needs and in access to opportunity, replacing

reaches every activity performed by HACM in the administration of its Section 8 program, including "enforcing the terms of its HAP contract with landlords." (Opp'n 9.)

Further, Plaintiff extracts and emphasizes particular terms of the HAP contract between HACM and Madrigal that bound Madrigal "to not discriminate against [Chhang] because of disability in connection with the HAP contract"; "to cooperate with [HACM] and HUD in conducting equal opportunity compliance reviews and complaint investigations in connection with the HAP contract"; and "to waive his right to terminate Chhang's tenancy 'to use the unit for personal or family use . . . during the initial learn term,' which ran one year." (Opp'n 9-10.) Plaintiff argues these terms conferred specific powers on HACM over Madrigal should Madrigal breach the HAP contract. (Opp'n 10.) Plaintiff argues HACM's powers contained within the HAP contract include withholding payment to Madrigal. (Id. (citing DRJN at 22, Part B ¶ 7(b)).) Plaintiff also points to the provision that confers authority to HACM "to compel Madrigal to 'cooperate with the PHA and HUD in conducting…complaint investigations in connection with' Madrigal's denial of Plaintiff's request for reasonable accommodations." (Id. (citing DRJN at 23, Part B ¶ 9(b)).)[6] Plaintiff argues the HAP contract also authorized HACM to serve written notice to Madrigal that terminating Plaintiff's tenancy so Madrigal's son could occupy the unit violated the HAP contract. (Id. (citing DRJN at 25, Part B ¶ 16; id. at 27, Part C ¶ 8(d)).) Plaintiff points out the HAP contract also authorized HACM to pursue judicial remedies against Madrigal or require that he "take corrective action, as verified or determined by [HACM] by a deadline prescribed in the notice." (Opp'n 10-11 (citing DRJN at 23, Part B ¶ 10(b), (d)).)

Plaintiff contends HACM failed to exercise any of these powers. (Opp'n 11.) The Court notes federal regulations and the HAP contract itself do not refer to the specified sections within

---

segregated living patterns with truly integrated and balanced living patterns, transforming racially or ethnically concentrated areas of poverty into areas of opportunity, and fostering and maintaining compliance with civil rights and fair housing laws." 24 C.F.R. § 5.151.

[6] The Court notes Plaintiff does not allege she complained to HACM about Madrigal's denial of her request for reasonable accommodation to allow Onyx to live in the unit with her. The FAC only alleges that on November 8, 2022, Plaintiff "called HACM asking for help in responding to Madrigal's notices terminating her tenancy." (FAC ¶ 42.) While Madrigal allegedly emailed a copy of the denial of reasonable accommodation letter to HACM, Madrigal never advised HACM that Plaintiff's tenancy was being terminated for a discriminatory or retaliatory reason. (FAC ¶ 32.) To the contrary, the FAC expressly alleges Madrigal informed both Plaintiff and HACM that Plaintiff's tenancy was being terminated so Madrigal's son could move into the unit. (FAC ¶ 37.)

1    Part B of the HAP contract as "powers"; rather, they are characterized as "rights and remedies."

2    FHA's implementing regulations expressly state that PHAs "*may* exercise any rights and

3    remedies against the owner under the HAP contract."  24 C.F.R. § 982.456(a) (emphasis added).

4    Further the HAP contract itself provides that if a PHA determines that an owner breached the

5    HAP contract, "the PHA *may* exercise any of its rights and remedies under the HAP contract, or

6    any other available rights and remedies for such breach. The PHA shall notify the owner…. The

7    notice by the PHA to the owner *may* require the owner to take corrective action, as verified or

8    determined by the PHA…."   (DRJN at 23, Part B ¶ 10(b) (emphasis added).)  Further, "[t]he

9    PHA *may* seek and obtain additional relief by judicial order or action, including specific

10   performance, other injunctive relief or order for damages."   (DRJN at 23, Part B ¶ 10(d)

11   (emphasis added).)

12          Plaintiff is not a party to or third-party beneficiary of the HAP contract and therefore

13   cannot enforce any provision or assert any claim against HACM under the HAP contract.  24

14   C.F.R. § 982.456(b)(1), (c).[7]  Therefore, HACM may enforce its rights and remedies in the HAP

15   contract against Madrigal, but Plaintiff has no private right of action against HACM for its

16   failure to enforce those rights and remedies.  Thus, to the extent Plaintiff is asserting claims

17   against HACM for failure to enforce the HAP contract, her claims must fail.  However, the Court

18   finds the rights and remedies contained within the HAP contract may be relevant to show the

19   scope of HACM's authority given Plaintiff's argument that HACM had an extrinsic duty to take

20   corrective action against Madrigal.  In support of her argument that "HACM is liable because it

21   exercised none of [its] powers [in the HAP contract], *even though it was obligated to do so*,"

22   Plaintiff provides various statutes and HUD regulations in her complaint and briefing which

23   purportedly establish HACM's duty.  (Opp'n 12 (emphasis added).)  The Court addresses each in

24   turn.

25          Plaintiff's complaint states "federal law, regulations, and ACC contract provisions

26

27   [7] A tenant is not without remedy, however, because the tenant "may exercise any right or remedy against the *owner*
     under the lease between the tenant and the owner, including enforcement of the owner's obligations under the
     tenancy addendum" located in Part C of the HAP contract.  24 C.F.R. § 982.456(2) (emphasis added).  Notably, Part

28   C includes limitations on an owner's ability to terminate a tenancy during the initial lease term.

1    obligated HACM to take affirmative action against Madrigal to protect or remedy violation of

2    Section 8 regulation and Chhang's civil rights."  (FAC ¶ 44.)  She cites 42 U.S.C. § 3608(f) as

3    authority mandating HACM's "affirmative obligation."  (Id.)  However, section 3608(f) lists the

4    "provisions of law and Executive orders to which section 3608(e)(6) applies[.]" 42 U.S.C. §

5    3608(f).  Section 3608(e)(6) requires that the Secretary of HUD "annually report to the Congress,

6    and make available to the public, data on the race, color, religion, sex, national origin, age,

7    handicap, and family characteristics" of persons who are applicants, participants, or beneficiaries

8    of HUD-administered programs that are covered by the list of laws specified in section 3608(f).

9    The Court finds neither Section 3608(f) nor HUD's reporting requirements to Congress under

10   section 3608(e)(6) obligated HACM to take affirmative action against Madrigal to remedy his

11   alleged discriminatory housing practices when it received notices of the denial of Plaintiff's

12   request for reasonable accommodation or early termination of the lease.

13        Plaintiff also cites 24 C.F.R. § 5.105(a)(1) in her complaint as "list[ing] the laws under

14   which HACM has an affirmative duty to further fair housing rights and compliance." (FAC ¶

15   44.) However, section 5.105(a)(1) broadly lists nondiscrimination and equal opportunities to

16   public housing pursuant to the FHA and its implementing regulations as "requirements" that

17   "apply to all HUD programs," including the Section 8 housing program.  See also 24 C.F.R. §

18   982.53(a) (requiring PHAs to comply with all equal opportunity requirements imposed by

19   contract or federal law, "including the authorities cited at 24 C.F.R. § 5.105(a)" and the ADA);

20   see also 24 C.F.R. § 982.53(b)(1), (2) (requiring a PHA to annually certify to HUD that it will

21   administer the program in conformity with the FHA, Rehabilitation Act and ADA and "will

22   affirmatively further fair housing in the administration of the program."). Here, however, HACM

23   does not dispute the FHA applies to it as a PHA administering a Section 8 Program.  (Reply 2.)

24   It is also undisputed that HACM did not engage in any discriminatory conduct itself.  Thus,

25   while section 5.105(a) contains an extensive list of nondiscrimination and equal opportunity

26   requirements that includes the FHA and its implementing regulations, Plaintiff fails to point to

27   any authority that specifically imposes a duty on a PHA to take affirmative action against a

28   private landlord for his alleged discriminatory housing practices against a Section 8 tenant.

Plaintiff also argues HACM is directly liable under 24 C.F.R. § 100.7(a)(1)(iii), which HUD published in 2016. Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices Under the Fair Housing Act ("Quid Pro Quo"), 2016 WL 4762170, 81 Fed. Reg. 63054-01, 63068 (Sept. 14, 2016). Section 100.7(a)(1)(iii) provides that a person is directly liable for:

> Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it. The power to take prompt action to correct and end a discriminatory housing practice by a third-party depends upon the extent of the person's control or any other legal responsibility the person may have with respect to the conduct of such third-party.

24 C.F.R. § 100.7(a)(1)(iii). "Section 100.7 merely defines the scope of liability (direct or vicarious) that is applicable to the FHA, and is not an independent mechanism through which [a plaintiff] can raise a claim." Siguel v. King Farm Citizens Assembly, Inc., No. CV GLS 22-672, 2023 WL 6643348, at *8 (D. Md. Oct. 12, 2023). "HUD's rule [in section 100.7(a)(1)(iii)] mirrors the scope of employer liability under Title VII for employee-on-employee harassment." Harris v. Vanderburg, 584 F. Supp. 3d 82, 93 (E.D.N.C. 2022) (quoting Wetzel v. Glen St. Andrew Living Cmty., 901 F.3d 856, 866 (7th Cir. 2018).)

Few courts have applied section 100.7(a)(1)(iii) since it was published by HUD nearly a decade ago. Plaintiff cites no authority—and the Court finds none—that applies section 100.7(a)(1)(iii) to similar facts as those present in the instant action. Rather, authorities that have evaluated liability under section 100.7 have grappled with the regulation when determining whether a property owner should be found directly or vicariously liable for tenant-on-tenant or employee-on-tenant harassment. See, e.g., United States v. Pedaline, No. 4:23-CV-01744, 2024 WL 712347, at *3 (N.D. Ohio Feb. 21, 2024) (denying a motion to dismiss where the complaint plausibly alleged facts that the property owner was directly liable for alleged sexual harassment of tenants by its property manager); Trujillo v. Amity Plaza, LLC, No. 23-CV-01019-CMA-SKC, 2024 WL 358129 (D. Colo. Jan. 31, 2024) (finding a tenant adequately pleaded that the PHA, which unilaterally and exclusively controlled a LLC that owned and operated the apartment building, could be vicariously liable under the FHA for a worker's alleged sexual

assault of tenant); <u>Wetzel</u>, 901 F.3d at 866 (evaluating tenant-on-tenant harassment, the Seventh Circuit noted section 100.7(a)(1)(iii) interprets the FHA to make *a landlord* directly liable for failing to "take prompt action to correct and end a discriminatory housing practice by a third party" if *the landlord* "knew or should have known of the discriminatory conduct and had the power to correct it") (emphasis added).

While the Ninth Circuit has not previously evaluated section 100.7(a)(1)(iii),[8] HUD's construction of the FHA "is entitled to great weight," <u>Trafficante v. Metro. Life Ins. Co.</u>, 409 U.S. 205, 210 (1972), and HUD's interpretation of the FHA is afforded <u>Chevron</u> deference, <u>Meyer v. Holley</u>, 537 U.S. 280, 287–88 (2003).[9]  However, as noted, section 100.7(a)(1)(iii) has not been interpreted—by either HUD or any court—in the context of the facts presented in the instant action.  Applying the language of section 100.7(a)(1)(iii), Plaintiff avers HACM had actual knowledge that Madrigal had engaged in discriminatory housing practices because Madrigal forwarded HACM both the letter wherein he denied Plaintiff's request for reasonable accommodation and the notices of early termination of the lease.  (Opp'n 12.)  Plaintiff therefore argues that HACM is directly liable under 100.7(a)(1)(iii) for having knowledge of Madrigal's discriminatory practices but failing to correct or end such practices using HACM's power to enforce the discretionary rights and remedies provided by the HAP contract.  Madrigal—the property owner, manager, operator, and direct housing provider—is therefore considered the "third party" under Plaintiff's application of section 100.7(a)(1)(iii) in the instant action.

The Court finds HACM is not directly liable for violations of the FHA under the scope of liability interpreted by HUD in section 100.7(a)(1)(iii).  To find otherwise would be an unwarranted expansion of a HUD regulation to create enhanced liability against PHAs that neither own, operate, nor manage a property nor engage in any discriminatory conduct.  When promulgating section 100.7(a)(1)(iii), HUD repeatedly emphasized that the rule "does not add

---

[8] The Ninth Circuit has once generally cited 24 C.F.R. § 100.7 to show HUD's regulations do not mention an interactive process.  <u>Howard v. HMK Holdings, LLC</u>, 988 F.3d 1185, 1192 (9th Cir. 2021) (holding there is no standalone liability under the FHA for a landlord's failure to engage in an interactive process with a disabled tenant).

[9] Even without affording HUD's interpretation of the FHA <u>Chevron</u> deference, the Court's conclusion would be the same.

any new forms of liability under the [FHA] or create obligations that do not otherwise exist." Quid Pro Quo, 2016 WL 4762170 at *63068; see also id. at *63069 (noting section 100.7 "does not create new or enhanced liabilities for housing providers, including those who participate in the Section 8 program"); id. at 63070 (Section 100.7 "does not add any new forms of liability under the Fair Housing Act"); id. at 63073 (emphasizing that section 100.7 "imposes no new legal obligations or duties of care"); id. (section 100.7 "does not change substantive obligations, but merely formalizes them in a regulation").

HUD further clarified that "[i]n the context of the rule, liability for discriminatory conduct by a 'third party' is appropriately limited to a non-employee or non-agent who engaged in quid pro quo or hostile environment harassment of which the housing provider knew or should have known and had the power to correct." 2016 WL 4762170 at *63067. It does not appear that HUD's interpretation intended the third-party to be the direct housing provider and liability to extend to the PHA that issues the Section 8 housing vouchers. Further, while caselaw regarding section 100.7 is scarce, one district court has explained:

> Section 100.7(a)(1)(iii) simply extends the concept of direct liability embodied in Section 100.7(a)(1)(ii) to the discriminatory conduct of non-employees or non-agents, such as a tenant-to-tenant harassment if the housing provider has the power to correct the discriminatory conduct. Section [100.7(a)(1)(iii)] does not expand the universe of persons who may be directly liable—housing providers. Rather, [100.7(a)(1)(iii)] expands the universe of persons whose conduct a housing provider may be directly liable for failing to control. Such reasoning is consistent with HUD's statement that Section [100.7] does not create new or enhanced liability; rather, it reflects existing law….

Brown v. Pfeiffer, No. 19-CV-3132 (WMW/KMM), 2020 WL 6146614, at *4 (D. Minn. Oct. 20, 2020); see also Fair Hous. Council of Riverside Cnty., Inc. v. Grp. XIII Properties LP, No. EDCV21941JGBKKX, 2023 WL 4680764, at *29 (C.D. Cal. Apr. 27, 2023) (same).

Critically, section 100.7(a)(1)(iii) expressly limits liability to "the extent of the person's control or other legal responsibility the person may have with respect to the conduct of such third party." 24 C.F.R. 100.7(a)(1)(iii). HUD clarified that under this negligence standard, a plaintiff must prove three elements to establish a housing provider's liability for third-party harassment: "(1) The third-party created a hostile environment for the plaintiff; (2) the housing provider knew

1    or should have known about the conduct creating the hostile environment; and (3) the housing

2    provider failed to take prompt action to correct and end the harassment while having the power

3    to do so."  Quid Pro Quo, 2016 WL 4762170 at *63069-70.  HUD detailed its interpretation of

4    the third element regarding control as follows:

5            [w]hether a housing provider has the power to take corrective
             measures in a specific situation—and what corrective measures are
6            appropriate—is dependent on the facts, including the extent of
             control or any other legal responsibility the person may have with
7            respect to the conduct of such third-party. There may be instances
             where the ability to correct the unlawful conduct is beyond a
8            housing provider's control. Thus, when confronted with
             discriminatory harassment of one of its Housing Choice Voucher-
9            holders or other tenants, the housing agency should explore what
             corrective actions are within its power and are appropriate to take.
10

11   Id. at 63071.  Given this clarification, the Court again notes HUD appears to have intended that a

12   PHA be pulled into the realm of direct liability under section 100.7(a)(1)(iii) when it is acting as

13   the property manager, owner, or operator, and not where the third party is the private landlord.

14   (Id.)  The Court also finds one district court's discussion of the level of power required in the

15   harassment context to be instructive:

16           [L]iability for third-party conduct outside of a formal agency
             relationship exists only if the landlord has 'substantial control over
17           the context in which the harassment occurs and over the harasser.'
             Francis [v. Kings Park Manor, Inc.], 992 F.3d [67,] 75, 77 n.40
18           [(2d. Cir. 2021) (en banc)]; see, e.g., Wetzel, 901 F.3d at 860–65
             (liability for tenant-on-tenant harassment when landlord had the
19           ability to change tenants' dining room assignments, deny access to
             common areas listed in the lease, deny access to cleaning services,
20           and ability to enter apartments without notice). In such a case,
             "[t]he typical powers of a landlord over a tenant—such as the
21           power to evict"—does not suffice to establish a landlord's
             substantial control over the premises and the harasser. See Francis,
22           992 F.3d at 75. Stated differently, a mine-run landlord-tenant
             relationship will not suffice for liability under section
23           100.7(a)[(1)](iii).

24   Harris, 584 F. Supp. 3d at 93–94 (emphasis added).

25           Even if section 100.7(a)(1)(iii) was intended to extend to contexts beyond an owner's

26   direct liability for tenant-on-tenant harassment and encompass a private landlord within the

27   meaning of a third party, Plaintiff fails to allege facts that establish that HACM had substantial

28   control over Madrigal.  According to Plaintiff's complaint, HACM was not a direct provider of

1   Plaintiff's housing; rather, its role was limited to issuing Section 8 vouchers in compliance with

2   the Program requirements governed under a HAP contract.  (FAC ¶¶ 22, 23.)  Madrigal is not

3   alleged to have worked for HACM nor is he alleged to be HACM's agent.  (See FAC ¶¶ 5, 6.)

4   HACM neither managed Plaintiff's apartment nor owned or operated the property.  (Id.)  HACM

5   was not a party to the lease between Plaintiff and Madrigal.  (See FAC ¶ 23.)  HACM argues it

6   has no means of compelling Madrigal to amend the no-pets rule in the lease to allow Plaintiff to

7   reside with her service animal.  (Mot. 14.)  As alleged, HACM did not have any input in

8   Madrigal's decision to deny Plaintiff's requests for reasonable accommodation.  (See FAC ¶ 32.)

9   Plaintiff does not allege HACM had knowledge of or was even involved in any of the texts,

10  emails, or discussions wherein Plaintiff requested a reasonable accommodation to the no-pets

11  rule.  (See FAC ¶¶ 24, 26-31.)  There are no allegations that HACM had any input in or incentive

12  for Madrigal's decision to terminate Plaintiff's lease early to allow his son to occupy the

13  premises.  (See FAC ¶¶ 37, 38.)[10]  Plaintiff alleges a HACM employee corresponded with

14  Madrigal's employee to inquire about the length of the notice of termination, but otherwise

15  provided no advice or input.  (FAC ¶ 39.)  The allegations in Plaintiff's complaint do not

16  establish that HACM had substantial control over the apartment or Madrigal such that it can be

17  directly liable for failing to correct Madrigal's actions.  See Harris, 584 F. Supp. 3d at 94.

18          Plaintiff argues HACM's "control" over Madrigal stems from HACM's powers contained

19  within the HAP contract.  (Opp'n 12.)  To the extent Plaintiff is not asserting a claim against

20  HACM for failure to enforce the HAP contract and instead uses the HAP contract to show that

21  "HACM has several powers that it *could* have exercised," the Court is not persuaded that the

22  HAP contract gave HACM substantial control over Madrigal, a private landlord.  (Opp'n 12.)

23  _____

24  [10] HACM's argument that Plaintiff's allegations that Madrigal terminated her lease to allow his son to occupy the
    unit evince that her disability was not the cause of termination of her tenancy is well-taken.  (Mot. 9.)  Sections
25  3604(f)(1)-(2) and 3617 require that Plaintiff allege her housing was made unavailable *due to her disability*.
    Plaintiff must allege that HACM knew or should have known Madrigal terminated Plaintiff's tenancy because of her
26  disability, or in retaliation for her requests, and have the power to take corrective action. While Plaintiff insinuates in
    her briefing that the "timing alone raises the inference of retaliation," she points to no allegations in her complaint
27  that establish HACM knew or should have known that Madrigal was terminating her lease in retaliation for her
    requests for reasonable accommodation.  (Opp'n 12.)  Further, Plaintiff does not allege HACM took any action;
28  rather, Plaintiff alleges HACM employees failed to advise Plaintiff and Madrigal that early termination was
    prohibited.  Cf. Wetzel, 901 F.3d at 860 (noting that had the defendants "done nothing but listen, we might have a
    more limited case. But they took affirmative steps to retaliate against [the plaintiff] for her complaints.")

1   The Court finds the limited federal court decisions evaluating section 100.7(a)(1)(iii) instructive.

2   If typical powers of a landlord over a tenant—such as the power to evict—do not establish

3   substantial control between a landlord and tenant, a form HAP contract generated by HUD that

4   provides discretionary rights and remedies likewise does not establish HACM had substantial

5   control over Madrigal such that it is directly liable for failing to take corrective action.  See

6   Harris, 584 F. Supp. 3d at 93–94.  The Court therefore finds a "mine-run" PHA-private landlord

7   relationship does not suffice for liability under section 100.7(a)(1)(iii).  Id.

8       When promulgating section 100.7, HUD was clear that the rule did not create enhanced

9   liabilities on Section 8 housing providers, nor did it impose any new legal obligations or duties

10  of care.  Quid Pro Quo, 2016 WL 4762170 at *63069, 63073.  Plaintiff points out that the

11  Supreme Court has determined that the FHA "focuses on prohibited acts." (Opp'n 4 (quoting

12  Meyer, 537 U.S. at 285).)  However, Plaintiff's broad reading of 100.7(a)(1)(iii) adds a new form

13  of liability on a PHA that goes beyond prohibited acts: Even if the PHA does not own, manage,

14  or operate the property, does not have substantial control over the private landlord, nor engages

15  in any discriminatory conduct itself, the PHA has a duty to take affirmative action and enforce

16  the rights and remedies contained within the HAP contract against the private landlord and

17  therefore may be found liable for failing to do so.  This would be an unwarranted expansion of

18  the FHA and HUD's already-broad implementing regulation with no hint of congressional

19  authority or HUD intention.

20      The Court is not persuaded Plaintiff's cited statutes or implementing regulations support

21  her allegations that HACM had a duty or obligation to exercise the discretionary rights and

22  remedies within the HAP contract when it received notice of Madrigal's letters.   At the hearing

23  held in this matter, Plaintiff noted Langlois v. Abington Housing Authority, 234 F. Supp. 2d 33

24  (D. Mass. 2002) as the most instructive authority supporting liability against HACM.  (See also

25  Opp'n 7.)  In Langlois, a group of housing authority residents brought 42 U.S.C. § 1983 claims

26  against multiple PHAs for their alleged violations of section 3608(e)(5) of the FHA, section

27  1437c-1(d)(15) of the Quality Housing and Work Responsibility Act, and Executive Orders

28  11063 and 12892 in their administration of federal housing programs.  Langlois, 234 F. Supp. 2d

at 37.  The plaintiffs' legal claims stemmed from two alleged "wrongs": the PHAs' proposed implementation of residency preferences and the logistics of a lottery application process used when selecting applicants.  Id. at 46.  Therein, the district court noted that when signing and submitting a signed certification to HUD pursuant to 24 C.F.R. § 982.53(b)-(c) and 24 C.F.R. § 903.7(o), such "regulations unambiguously impose mandatory requirements on the PHAs not only to *certify* their compliance with the fair housing laws, but actually to *comply*."  Id. at 76 (emphasis in original).

The Court finds Langolis is not instructive to determine whether HACM had a legal duty or obligation that would require HACM to take corrective action against Madrigal on the instant facts.  Critically, unlike Plaintiff's allegations here, the Langolis plaintiffs were suing the PHAs for the PHAs' own discriminatory conduct, not the failure to take corrective action for a non-employee and non-agent's alleged discriminatory housing practices.  Id. at 37.  While the Court agrees with the purpose of the regulations as expressed in Langolis, the case is distinguishable from the instant matter.[11]

The Court finds Plaintiff fails to state a claim against HACM under the FHA.  Accordingly, the Court grants HACM's motion to dismiss Plaintiff's first amended complaint without leave to amend.

### 2.    The FEHA Claim

"In federal court, the standards for FHA and FEHA housing discrimination causes of action are the generally same."  Mengistu v. Forestview Apartments, LLC, No. 219CV05118ODWJCX, 2022 WL 2159257, at *4 (C.D. Cal. June 15, 2022) (citing Walker v. City of Lakewood, 272 F.3d 1114, 1131 n.8 (9th Cir. 2001)).  A Plaintiff alleging a violation of

---

[11] The Court also finds the three other cases cited by Plaintiff in support of her unopposed argument that PHAs may be held liable under FHA and FEHA to be unsupportive of, if not adverse to, Plaintiff's claims against HACM.  See Huynh v. Sanchez, No. 5:14-CV-02367-LHK, 2014 WL 4364846 at *7-8, *11 (N.D. Cal. Sept. 2, 2014) (finding the plaintiff plausibly alleged that the PHA's conduct in restricting his housing voucher failed to reasonably accommodate his disability, despite not owning the plaintiff's housing); Thompson v. U.S. Dep't of Hous. & Urban Dev., 348 F. Supp. 2d 398, 462 (D. Md. 2005) (finding the PHA did *not* violate the FHA by failing to adequately consider regional approaches to ameliorate racial segregation in public housing); Taylor v. The Hous. Auth. of New Haven, 267 F.R.D. 70, 74-75 (D. Conn. 2010) (noting a PHA's failure to respond to a plaintiff's request was "because of bureaucratic incompetence" not discriminatory intent and doubting whether the PHA "had the power to control private landlords and force or coerce them to provide accessibility features" when finding the evidence failed to show the PHA violated the plaintiffs' claims under the Rehabilitation Act and FHA).

1    FEHA must show: (1) plaintiff is handicapped within the meaning of 42 U.S.C. § 3602(h); (2)

2    the defendant knew or should reasonably be expected to know of the handicap; (3)

3    accommodation of the handicap may be necessary to afford the handicapped person an equal

4    opportunity to use and enjoy the dwelling; (4) the accommodation is reasonable; and (5) the

5    defendant refused to make the requested accommodation. Id. (citing Dubois v. Ass'n of Apt.

6    Owners of 2987 Kalalaua, 453 F.3d 1175, 1179 (9th Cir. 2006)).   "Because FEHA is based on

7    the Fair Housing Act, liability under the Fair Housing Act also supports liability under FEHA."

8    Iniestra v. Cliff Warren Invs., Inc., 886 F. Supp. 2d 1161, 1169 (C.D. Cal. 2012).   However,

9    FEHA is "intended to conform to the general requirements of federal law in the area and may

10   provide greater protection against discrimination." Auburn Woods I Homeowners Assn. v. Fair

11   Emp. & Hous. Com., 121 Cal. App. 4th 1578, 1591 (2004).

12          Plaintiff argues the basis for holding HACM liable in the instant action is "even more

13   robust" under FEHA.  (Opp'n 13.)  Under 2 C.C.R. § 12010(a)(1)(C), a person is directly liable

14   for:

15               Failing to take prompt action as determined on a case-by-case basis
                 to correct and end a discriminatory housing practice by a third-
16               party, where the person knew or should have known of the
                 discriminatory conduct and had the power to correct it. The power
17               to take prompt action to correct and end a discriminatory housing
                 practice by a third-party depends upon the extent of any legal
18               responsibility or authority the person may have with respect to the
                 conduct of such third party. The power, responsibility, or authority
19               can be derived from sources including contracts, leases, common
                 interest development governing documents, or by federal,
20               California, or local laws, regulations, or practices.

21   2 C.C.R. § 12010(a)(1)(C).   Thus, section 12010(a)(1)(C) is identical to 24 C.F.R.

22   100.7(a)(1)(iii) with the addition of identifying specific categories of potential sources for the

23   housing provider's power, responsibility, or authority.

24          Plaintiff argues the reference to "contracts" in section 12010(a)(1)(C) embraces the HAP

25   contract executed between HACM and Madrigal.  (Opp'n 13.)  However, the Court assumed in

26   its analysis of Plaintiff's FHA claim that Plaintiff was not suing HACM for failure to enforce the

27   HAP contract; rather, her reference to the HAP contract was merely defining the scope of

28   HACM's discretionary rights and remedies because it is related to determining whether HACM

had substantial control over Madrigal.  "Although there is even less case law applying [section 12010(a)(1)(C)], the Court sees no reason why the result would be different."  <u>Fair Hous. Council of Riverside Cnty., Inc.</u>, 2023 WL 4680764 at *30 (evaluating section 100.7(a)(1)(iii) and section 12010(a)(1)(C)).  For the same reasons as those expressed in detail in determining that HACM is not liable under section 100.7(a)(1)(iii), the Court finds section 12010(a)(1)(C) does not provide a basis to hold HACM directly liable under an identical negligence standard.

The Court finds Plaintiff fails to state a claim against HACM under the FEHA. Accordingly, the Court grants HACM's motion to dismiss Plaintiff's first amended complaint without leave to amend.

### 3.    The ADA and Rehabilitation Act Claims

Title II of the ADA "prohibits public entities from both discriminating against qualified individuals because of a disability and excluding such individuals from benefitting from or participating in a public program because of their disability."  <u>Razon v. Cty. of Santa Clara</u>, No. 17-CV-00869-LHK, 2018 WL 405010, at *9 (N.D. Cal. Jan. 12, 2018) (citing 42 U.S.C. § 12132).  To prove a public program violated Title II of the ADA, a plaintiff must allege: (1) he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  <u>Duvall v. Cty. of Kitsap</u>, 260 F.3d 1124, 1135 (9th Cir. 2001) (quotation omitted).  The failure to provide reasonable accommodations can constitute discrimination. <u>Updike v. Multnomah Cnty.</u>, 870 F.3d 939, 951 (9th Cir. 2017) (citation omitted).

To assert a claim under the Rehabilitation Act, the public program must receive federal financial assistance.  <u>Zukle v. Regents of Univ. of Cal.</u>, 166 F.3d 1041, 1045 (9th Cir. 1999). ADA and Rehabilitation Act claims may otherwise be evaluated together because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act."  <u>Id.</u> at 1045 n.11.

HACM moves to dismiss Plaintiff's second cause of action under the ADA and third cause of action under the Rehabilitation Act for failure to state a claim.  Plaintiff argues she has

alleged sufficient facts to show that HACM's own conduct resulted in violations of the ADA when HACM: (1) denied Plaintiff the opportunity to participate in or benefit from the Section 8 program pursuant to 28 C.F.R. § 35.130(b)(1)(i); (2) aided Madrigal's discrimination against Plaintiff by providing "significant assistance" to him that discriminated against Plaintiff on the basis of her disability pursuant to 28 C.F.R. § 35.130(b)(1)(v); and (3) by utilizing methods of administration of the Section 8 program for the purpose or effect of which (i) subjected Plaintiff to discrimination on the basis of handicap and (ii) defeated or substantially impaired the accomplishment of the objectives of the program pursuant to 28 C.F.R. § 35.130(b)(3).  (Opp'n 13-14 (citing FAC ¶¶ 22-49).)

Plaintiff further argues the same facts alleged in the complaint that show HACM violated the ADA also established that HACM failed to comply with the Rehabilitation Act.  (Opp'n 14.) Plaintiff avers she has alleged a claim under the Rehabilitation Act against HACM when it (1) denied Plaintiff the opportunity to participate in, or benefit from HACM's Section 8 program pursuant to 24 C.F.R. § 8.4(b)(1)(i); (2) provided Plaintiff with housing, aid, benefit, or service that is not as effective in affording the individual an equal opportunity to gain the same benefit, or to reach the same level of achievement as that provided to others pursuant to 24 C.F.R. § 8.4(b)(1)(iii); (3) provided "significant assistance" to Madrigal to discriminate against Plaintiff on the basis of handicap in providing its Section 8 program pursuant to 24 C.F.R. § 8.4(b)(1)(v); (4) limited Plaintiff in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving Section 8 benefits pursuant to 24 C.F.R. § 8.4(b)(1)(viii); and, (5) utilized its methods of administration of the Section 8 program the purpose or effect of which (i) subjected Plaintiff to discrimination on the basis of handicap; and (ii) defeated or substantially impaired the accomplishment of the objectives of the HACM's Section 8 program for Plaintiff pursuant to 24 C.F.R. § 8.4(b)(4).  (Opp'n 14-15 (citing FAC ¶¶ 22-49).)

As a threshold matter, Plaintiff's complaint and briefing is sparse in addressing her ADA and Rehabilitation Act claims.  For the same general reasons that apply to Plaintiff's FHA claim, Plaintiff's ADA and Rehabilitation Act claims fail.  Plaintiff avers federal courts routinely subject PHAs to the requirements of the ADA and Rehabilitation Act and cites multiple cases in

support.  (Opp'n 5-6.)   However,   HACM contends it does not dispute that the ADA and Rehabilitation Act apply to it.  (Reply 2.)  Further, as HACM points out, in each case cited by Plaintiff, the PHAs were liable under the ADA and Rehabilitation Act because they were the property owners and/or the entity that terminated or denied the plaintiffs' benefits or tenancy on the basis of discrimination.[12]  As discussed, HACM did not own the apartment, nor did it deny or terminate the Section 8 benefits or Plaintiff's lease due to her disability.

Plaintiff does not allege any facts that show HACM may be held liable for Madrigal's denial of Plaintiff's request for reasonable accommodation under the ADA or Rehabilitation Act. The Court notes the limited allegations previously described regarding HACM's involvement are insufficient to establish that HACM provided "significant assistance" to Madrigal to discriminate against Plaintiff on the basis of her disability.  (Opp'n 13, 14 (citing 28 C.F.R. § 35.130(b)(1)(v); 24 C.F.R. § 8.4(b)(1)(v)).)  To the contrary, Plaintiff plainly alleges HACM's failure to act is at issue.   Further,  as  previously  noted,  Madrigal  only  informed  HACM  he  was  terminating Plaintiff's lease early for reasons that were not related to her disability or request for reasonable accommodation.  (FAC ¶ 37.)  Similar to its arguments against Plaintiff's FEHA and FHA claims, HACM maintains Madrigal—not HACM—was responsible for Plaintiff's alleged injury. (Id.)

Plaintiff argues, both in her briefing and at the hearing, that two regulations support finding HACM directly liable under the Rehabilitation Act and ADA.  Plaintiff briefly argues 24 C.F.R. § 8.1 establishes HACM's liability.  (Opp'n 9.)  However, section 8.1 explains the purpose of section 504 of the Rehabilitation Act, which is to ensure  "no otherwise qualified individual with handicaps in the United States shall, solely by reason of his or her handicap, be

---

[12] Sinisgallo v. Town of Islip Hous. Auth., 865 F. Supp. 2d 307 (E.D.N.Y. 2012) (finding the plaintiffs adequately showed the PHA failed to provide or consider a reasonable accommodation in violation of the FHA, ADA, and Rehabilitation Act before terminating the disabled plaintiffs' tenancy); Majors v. Hous. Auth. of DeKalb Cnty. Ga., 652 F.2d 454 (5th Cir. 1981); (the PHA operated the property and terminated the plaintiff's tenancy); Young v. District of Columbia Hous. Auth., 31 F. Supp. 3d 90 (D.D.C. 2014) (denying a motion to dismiss where plaintiffs adequately alleged a PHA's acts and omissions violated the Rehabilitation Act, ADA, and FHA by failing to make its programs accessible to people with hearing disabilities); Cason v. Rochester Hous. Auth., 748 F. Supp. 1002 (W.D. N.Y. 1990) (finding a PHA's requirement that handicapped housing applicants prove an ability to live independently had effect of discrimination which violated the FHA and Rehabilitation Act); Lloyd v. Hous. Auth. of City of Kirksville, 58 F.3d 398 (8th Cir. 1995) (the PHA operated the housing complex).

1   excluded from the participation in, be denied the benefits of, or be subjected to discrimination

2   under any program or activity receiving Federal financial assistance from [HUD]."  Id.  Plaintiff

3   further argues that 24 C.F.R. § 8.2 specifies that section 8.1's mandate applies to a PHA's

4   operation of programs and activities in the administration of its Section 8 program.  (Opp'n 9.)

5       The Court finds neither section 8.1 nor section 8.2 imposes liability on HACM under the

6   Rehabilitation Act or ADA on the facts alleged in the first amended complaint.  It is undisputed

7   that HACM provided Plaintiff financial assistance to afford the monthly rent for Apartment 7.

8   (FAC ¶ 22.)  Plaintiff does not allege that HACM directly engaged in any conduct that excluded

9   Plaintiff from participation in, being denied the benefits of, or being subject to discrimination

10  under the Section 8 program.  Further, Plaintiff fails to allege that HACM terminated her lease or

11  affected her receipt of Section 8 benefits on the basis of her disability.  Plaintiff does not

12  otherwise allege that, as a result of HACM's conduct or for reasons under HACM's control, she

13  was denied access to the benefit of HACM's Section 8 program.

14      The Court finds Plaintiff fails to state claims against HACM under the ADA or

15  Rehabilitation Act.  Accordingly, the Court grants HACM's motion to dismiss Plaintiff's first

16  amended complaint without leave to amend.

17          **D.     Leave to Amend Would Be Futile**

18      Courts freely grant leave to amend a complaint which has been dismissed.  See Fed. R.

19  Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."); Schreiber

20  Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986) ("If a complaint is

21  dismissed for failure to state a claim, leave to amend should be granted unless the court

22  determines that the allegation of other facts consistent with the challenged pleading could not

23  possibly cure the deficiency."); Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000) (same).

24  Leave to amend generally shall be denied only if amendment would unduly prejudice the

25  opposing party, cause undue delay, be futile, or if the moving party has acted in bad faith.

26  Leadsinger, Inc. v. BMG Music Publishing, 512 F.3d 522, 532 (9th Cir. 2008). "These factors,

27  however, are not given equal weight. Futility of amendment can, by itself, justify the denial of ...

28  leave to amend."  U.S. ex rel. Insoon Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1052

1 | (9th Cir. 2001).

2 |   In her briefing, Plaintiff requests leave to amend to present additional factual allegations.

3 | (Opp'n 15.)  However, when asked by the Court at the hearing to provide a proffer of the additional

4 | factual allegations that Plaintiff intended to plead, Plaintiff maintained that the facts alleged within

5 | the first amended complaint are sufficient and failed to proffer additional facts.  The Court therefore

6 | finds Plaintiff's discrimination claims under the FHA, FEHA, ADA, and Rehabilitation Act

7 | against HACM cannot be cured by amendment.  Accordingly, the Court grants HACM's motion

8 | to dismiss the first through fourth causes of action in Plaintiff's first amended complaint without

9 | leave to amend and dismisses HACM as a named defendant in this action.

10 | **V.**

11 | **CONCLUSION AND ORDER**

12 |   For the foregoing reasons, IT IS HEREBY ORDERED that:

13 |     1.  Defendant HACM's request for judicial notice is GRANTED;

14 |     2.  Plaintiff's request for judicial notice is GRANTED;

15 |     3.  Defendant HACM's motion to dismiss (ECF No. 32-1) is GRANTED

16 |       without leave to amend; and

17 |     4.  Defendant HACM is dismissed from the instant action with prejudice.

18 |

19 | IT IS SO ORDERED.

20 | Dated: __**May 3, 2024**__

21 |              UNITED STATES MAGISTRATE JUDGE

22 |

23 |

24 |

25 |

26 |

27 |

28 |